# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ELSIE BEZA,

                    Plaintiff,

-vs-                                                    Case No.  6:05-cv-231-Orl-28JGG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.
_____

## MEMORANDUM OF DECISION

Plaintiff Elsie Beza ["Beza"] appeals to the district court from a final decision of the

Commissioner of Social Security [the "Commissioner"] denying her application for a period of

disability and supplemental security income benefits.  *See* Docket No. 1 (complaint).  For the

reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

On October 26, 2001, Beza filed a claim for supplemental security income (SSI), claiming

disability as of 1996 due to depression, asthma, mild anemia, an abnormal EKG, and high

cholesterol. R. 40-41, 49.  Her claim was denied on February 12, 2002. R. 30.  On July 8, 2004,

the Honorable Apolo Garcia, Administrative Law Judge ["ALJ"], held a thirty-minute hearing on

Beza's claim in Orlando, Florida.  R. 245- 64.  Beza represented herself at the hearing.  R. 248-49.

The ALJ heard testimony from Beza.  R. 246.

On September 30, 2004, the ALJ issued a decision that Beza was not disabled and not

entitled to benefits.  R. 22.  Following a review of the medical and other record evidence, the ALJ

found that Beza retained the residual functional capacity ["RFC"] to perform medium work with certain limitations; Beza could: stand, walk, and six for six hours in an eight-hour workday, and lift fifty pounds.  R. 22, Finding 5.  The ALJ also found that Beza had postural limitations in her abilities to climb, balance, stoop, kneel, crouch, and crawl, and that Beza had moderate limitations in her ability to accept and to respond to criticism from a supervisor and respond appropriately in the work-setting.  *Id.*  The ALJ found that Beza could perform her past relevant work as a mail sorter because it did not require the performance of work-related activities precluded by her RFC. *Id.*, Finding 6.  As Beza was not precluded from performing her past work, the ALJ concluded that Beza was not disabled.[1]  *Id.*, Finding 7-8.

After considering additional medical records, R. 7, 10, the Appeals Council denied review. R. 6.  On February 14, 2005, Beza timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1 at 1, ¶ 3.  On September 21, 2005, Beza filed in this Court a memorandum of law in support of her appeal.  Docket No. 17.  On November 21, 2005, the Commissioner filed a memorandum in support of her decision that Beza was not disabled.  Docket No. 18.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Beza assigns two errors to the Commissioner.  First, Beza claims that because Beza was not represented by counsel, the Commissioner erred by failing to obtain relevant records that

---

[1]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court. According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation. Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

support Beza's claim of disability, and thus failed to fully develop the record. Docket No. 16 at 4-5. Second, Beza contends that the Commissioner erred in failing to inquire about all of the physical and mental demands of Beza's past relevant work. *Id.* at 5-6.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that Beza did not meet her burden of proof as to disability and that the Commissioner fully developed the record. Docket No. 18-1 at 4, 10. Second, the Commissioner argues that the Commissioner properly determined the demands (both mental and physical) of Beza's past relevant work. *Id.* at 12.

## III.   THE STANDARD OF REVIEW

### A.   AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th

Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.    REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision.  *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the

need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and

appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the
> Commissioner of Social Security, but only upon a showing that there is new
> evidence which is material and that there is good cause for the failure to incorporate
> such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is

new, non-cumulative evidence; 2.) that the evidence is material —  relevant and probative so that

there is a reasonable possibility that it would change the administrative result; and 3.) there is good

cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 -

92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547,

1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v.*

*Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the

Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at

1095.  With a sentence-six remand, the parties must return to the district court after remand to file

modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending

remand, and does not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

**D.    STANDARD OF REVIEW WHERE APPEALS COUNCIL CONSIDERS NEW EVIDENCE**

After the ALJ's decision —  but before the Appeals Council decision — Beza submitted additional medical records covering from April 3, 1999 through August 12, 2004.[3]  R. 180-81, 237.  If a claimant submits evidence that does not relate to the relevant period under consideration, "the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and will advise [the claimant] of [his or her] right to file a new application."  20 C.F.R. § 404.976(b)(1)(2005).  The Appeals Council did not return the additional evidence to the claimant.  Rather, the Appeals Council properly made the evidence a part of the record, and also considered the evidence in denying review.  R. 6-8, 10.  The district court also must consider the new evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

Congress left the term "final decision" undefined in 42 U.S.C. § 405(g).  Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review,  the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405(g).  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083 (2000); *accord*, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983); *Williams v. Comm'r of Soc. Sec.*, 407 F. Supp. 2d 1297, 1302-03 (M.D. Fla. 2005) (Appeals Council's denial is a final decision of the Commissioner that is subject to judicial review under section 405(g)).   The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by

---

[3]Some of the new evidence submitted were duplicates of documents already in the record.  *See* R. 176-79, 182-84.

substantial evidence.  20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986) (en banc).  The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence. *Sims*, 120 S.Ct. at 2086.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's  review is similarly broad.  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000).  The Appeals Council, not the claimant, has the primary responsibility for identifying and developing the issues.  *Sims*, 120 S.Ct. at 2086.  When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review.  20 C.F.R. §§ 404.970(b); 416.1470(b); *Sims*, 120 S.Ct. at 2086;  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Furthermore, the Appeals Council commits reversible error when it refuses to consider new evidence and then denies review.  *Keeton*, 21 F.3d at 1066.  Similarly, it is *reversible error* for a district court to consider only the evidence presented to the ALJ — and to ignore the new evidence presented to the Appeals Council — in reviewing a decision of the Appeals Council.  *Keeton*, 21 F.3d at 1066.

The Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision.  *Sims*, 120 S.Ct. at 2086;  *Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir. 1998).  When the Appeals Council has denied review, the district court looks only to the evidence actually presented to the ALJ in determining whether the *ALJ's decision* is supported by substantial evidence.  *Falge*, 150 F.3d at 1323; *accord, Eads v. Sec'y of Health*

*and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him).  Nevertheless, there is an important difference between *Falge* and this case — a difference stressed by the United States Court of Appeals for the Eleventh Circuit.  In *Falge*, the claimant did not appeal the Appeals Council's decision to deny review.  Instead he appealed only the *ALJ's decision* to deny benefits.  150 F.3d at 1324.  In this case, however, the claimant does expressly appeal and seek a reversal of the Appeals Council's decision to deny review.  Docket No. 1 at 1, ¶ 2.  The Eleventh Circuit directs the district courts to consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of review.  *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066; *accord, Higgenbotham v. Barnhart*, 405 F.3d 332, 337-38 (5th Cir. 2005); *Williams*, 407 F. Supp. 2d at 1303.

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies.  When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error.  *Sims*, 120 S.Ct. at 2086;  *Keeton*, 21 F.3d at 1066.  Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error.  *See Falge*, 150 F.3d at 1324;  *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary

to the weight of the evidence currently of record).  The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies.  The Appeals Council has considered claimant's additional evidence in light of the issues raised in the request for review, has considered the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion, and determining that the ALJ's findings are supported by substantial evidence.  The Appeals Council's determination is subject to judicial review.  The Commissioner cannot avoid judicial review of the Appeals Council's final decision by passing a regulation defining the term "final decision of the Commissioner of Social Security" in 42 U.S.C. § 405(g) as the decision of the ALJ, and by calling the Appeals Council's final decision a "denial of review."  *See Sims*, 120 S.Ct. at 2086;  *accord, Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (Appeals Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405(g)); *Williams*, 407 F. Supp. 2d at 1302-03.

## IV.    THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.      DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### B.      THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520,  416.920.  First, if a claimant is working at a substantial gainful activity, she is not

disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"]. This assessment measures whether a claimant can perform past relevant work despite his or her impairment. 20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability. *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.     OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

-14-

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.  *Foote*, 67 F.3d at 1559.

## D.   TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Commissioner of Social Security*,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion

if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such

weight as is supported by clinical or laboratory findings and other consistent evidence of a

claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also,*

*Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must

nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and

the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.)

medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.)

specialization in the medical issues at issue; 6.) other factors which tend to support or contradict

the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally

entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d

513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a

medical source's statement that a claimant is disabled.  However, the ALJ is responsible for

making the ultimate determination about whether a claimant meets the statutory definition of

disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to

the status of a physician as treating or non-treating in weighing an opinion on whether the claimant

meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545

and 404.1546), or the application of vocational factors because those ultimate determinations are

for the Commissioner.  20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence.  *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.     PAIN

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.   20 C.F.R. § 404.1529.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v.*

-17-

*Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.     CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

G.     MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's

medical sources do not give sufficient medical evidence about an impairment to determine

whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143,

146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required

to order a consultative examination unless the record establishes that such an examination is

necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206,

1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order

such an evaluation may be reversible error).  Under the regulations, however, the ALJ may

determine that a consultative examination or other medical tests are necessary.  20 C.F.R.

§ 416.917 (1998).

H.     THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of

a medically determinable impairment, as well as consideration of the degree of limitation such

impairment may impose on the individual's ability to work.  The listings for mental disorders are

arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The criteria in

paragraphs B and C of the listings for mental disorders describe those functional limitations

associated with mental disorders which are incompatible with the ability to work — i.e.

limitations in functional areas deemed essential to work.  A mental impairment is medically

equivalent to a listed mental impairment if the medical findings are at least equal in severity and

duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the

-19-

criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace;  and ability to tolerate increased mental demands associated with competitive work).  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress). This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Some individuals may actually have worked

-21-

during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist.

-22-

These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

## V.   **APPLICATION AND ANALYSIS**

### A.   **THE FACTS**

Beza, born on December 7, 1958 (R. 35) and was forty-five years old on the day of the ALJ's decision (R. 17).  She has completed eleventh grade, and has past work experience as a mail sorter.  R. 42, 47.  Beza claims disability as of 1996 due to depression, asthma, diabetes, mild anemia, an abnormal EKG, and high cholesterol.  R. 41.  Her medical records from New York indicate a history of asthma and diabetes.  Beza lived in New York until approximately December 2003 when she moved to Florida.  *See* R. 259.

On April 3, 1999, Beza went to Jamaica Hospital Medical Center with complaints of itching (pruritis).  R. 87.  She told the hospital that her son had ringworm and that they shared a bed.  *Id.*  She presented no other complaints, and a physical examination of her was mainly normal.  R. 84-87, 236-38.  On October 10, 2000, Beza returned to the hospital complaining that she felt like she had water in her ears, but without any serious complaints.  R. 228-29.  Beza was

told to drink fluids and follow-up if she did not feel better.  R. 228.  Beza visited Jamaica Hospital

Center again on October 27, 2000 with back pain.  R. 226-27.  The doctor's impression was

neuralgia, and Beza was given pain medications.  R. 226.  On November 20, 2000, Beza went to

the hospital for re-fills of her asthma medication.  R. 224-25.

    Beza was admitted to Jamaica Hospital Medical Center on December 17, 2000 an asthma

attack.  R. 138, 221.  Discharge instructions dated December 20, 2000, show that Jamaica Hospital

Medical Center gave her asthma medication and medication and diet instructions. R. 138.  The

doctor did not note any special instructions or physical limitations on the form.  *See id.*  On

December 27, 2000, Beza returned to the hospital for a follow-up appointment.  R. 220-21.  The

doctor diagnosed Diabetes Mellitus, in addition to the previous diagnosis of Asthma.  R. 220.

    On January 2, 2001, Beza went to Jamaica Hospital Medical Center again for instruction

on how to control her diabetes.  R. 219.  Beza received instruction on diet and weight loss.  *Id.*

Two days later, on January 4, 2001, Beza went to the Podiatry Clinic at the hospital upon referral

for foot care related to her diabetes.  R. 218.  Beza had dry, flaky planter heels.  She was given

cream and "diabetic education."  *Id.*  Beza returned to the hospital on January 29, 2001,

complaining of anxiety.  R. 216.  Beza reported hyperventilating because she felt anxious about

diabetes and complying with her medication and dietary instructions.  *Id.*  The hospital placed her

on a waiting list to see psychiatrist Dr. Griso Blanco about her anxiety.  *Id.*

    On February 28, 2001, Beza sought treatment with Dr. Blanco.  Dr. Blanco diagnosed Beza

for "major depression, mild," anxiety disorder, asthma, and diabetes.  R. 96.  Dr. Blanco noted that

Beza was well-groomed, articulate, and cooperative.  R. 97.  Beza's psychomotor activity was

-24-

slightly increased, and Dr. Blanco noted that her mood was mildly depressed.  *Id.*  Dr. Blanco observed no evidence of thought disorder, delusion, or suicidal ideation.  *Id.*  Dr. Blanco recommended psychotherapy and an increase in Beza's dosage of Paxil.  R. 98.

Dr. Mie Lin performed a consultative examination on March 26, 2001.  R. 72.  Beza reporting having history of depression for one year, a history of asthma for twenty years, and a history of diabetes for three months.  *Id.*  Dr. Lin diagnosed unstable Depression, stable asthma, stable Diabetes, mild anemia, high cholesterol, and a borderline abnormal EKG.  R. 73.  Beza reported that she spent most of her time in her room and did her "ADLs" (activities of daily living) by herself.  R. 72-73.  Dr. Lin noted that Beza was able to perform household chores by herself or with the help of friends.  R. 73.  Beza also reported socializing sometimes with family and friends. *Id.*

A physical examination was normal.  Beza's chest and lungs were clear without wheezes, rales, or rhonchi.  R. 73.  Heart sounds were normal.  *Id.*  Dr. Lin noted that Beza was able to ambulate without assistance and had normal gait and station.  *Id.*  Her range of motion was full with no evidence of joint deformity, tenderness, or swelling.  *Id.*  Straight leg raising tests were normal with no evidence of focal neurological deficits.  *Id.*  Dr. Lin also observed that Beza's behavior and affect appeared unremarkable.  *Id.*  According to Dr. Lin, Beza retained functional abilities to: walk, sit, stand, lift, carry, and handle objects, except that Beza had moderate functional impairment in traveling as a result of her depression and asthma.  R. 73.  Dr. Lin further stated that Beza was able to perform "light activities."  *Id.*  Dr. Lin concluded that Keel's prognosis was "fair," and recommended that Beza follow-up with a treating physician.  R. 74.

Beza sought psychotherapy treatment with Blanco for a number of sessions between February 2001 and November 2001.  R. 92-95.  In a handwritten letter addressed "To Whom It May Concern" and dated March 28, 2001, Dr. Blanco stated she was writing the letter at Beza's request to "certify" that Beza was receiving psychotherapy treatment and taking psychotropic medications for Beza's "major" depression and anxiety disorder.  R. 150.  Dr. Blanco further wrote, "The patient is unable to work."  *Id.*  The same day that Dr. Blanco wrote the note, Beza reported feeling "nervous."  R. 92.  Dr. Blanco noted the Beza exhibit a tremor, but stated that she "felt better."  *Id.*  On April 6, 2001, Dr. Blanco saw Beza again and noted that Beza had "severe anxiety."  R. 92.  Dr. Blanco encouraged Beza to stay out of bed during the day, and set an appointment for the following week.  R. 93.

On May 2, 2001, Beza returned and reported feeling better, but still had complaints of feeling "nervous and depressed and tearful at times."  R. 93.  She reported having no hallucinations or delusions.  *Id.* On May 30, 2001, Beza reported feeling "much better," but was still feeling "slightly anxious."  R. 94.  On June 20, 2001, Beza and Dr. Blanco discussed Beza's inability to sleep.  *Id.*   On August 22, 2001, Beza returned feeling depressed and anxious.  R. 95.  She reported sleeping poorly and was nervous because her niece may be leaving with her father. *Id.*  On September 19, 2001, Beza was still anxious and restless.  *Id.*   On November 14, 2001, the final session in the record, Beza discussed her feelings regarding the World Trade Center attacks and the anthrax scare.  R. 95.  Her mood was anxious, but she had no delusions and denied suicidal or homicidal ideation.  *Id.*

Beza visited MediSys several times for re-fills of her asthma medications between February 16, 2001 and October 15, 2001.  R. 89-90, 102, 104, 209-15.  On September 12, 2001, Beza reported that she had run out of medication.  R. 102.  The MediSys notes indicate Beza had "no labs since 1/01 ordered - [patient] did not return for labs."  *Id.*

On October 26, 2001, Beza filed a claim for supplemental security income (SSI), claiming disability as of 1996 due to asthma, mild anemia, depression, an abnormal EKG, and high cholesterol. R. 40-41, 49.   In her application for benefits, she described her work as a clerk for the United States Post Office.  R. 42.  She prepared and sorted mail for delivery.  *Id.*  According to Beza, the clerk job required her to walk "all day," and stand, sit, climb, and stoop at various times. *Id.*  She lifted bundles of mail, lifting, at most, less than ten pounds but lifting that amount frequently.  *Id.*

On November 20, 2001, Beza was admitted to the emergency room at St. John's Hospital in Queens, New York, complaining of shortness of breath.  R. 79, 139.  The hospital report notes that Beza was having difficulty breathing and wheezing.  R. 79-80.  The discharging physician diagnosed asthma and an upper respiratory tract infection.  R. 81.  She was treated with Solmedrol and other medications and discharged on November 26, 2001.  *Id.*, R. 139.  Beza received instructions following her discharge from the hospital's Home Care Division on achieving stable respiratory status and a stable blood-sugar level and on taking her various medications.  R. 140-41. Notes from the Home Care division indicate that Beza's diagnoses was asthma and her mental status was "[o] riented" on November 28, 2001.  R. 142.

-27-

Dr. Richard King completed a consultative psychiatric examination on December 3, 2001. R. 70-71.  Beza brought her son to the interview because she was nervous.  R. 70.  She complained of being anxious and depressed since her mother's death eight years earlier, reported  sometimes she hearing her mother talking to her at nighttime before going to sleep.  *Id.*  Beza also told Dr. King that she had become fearful of people on the street.  *Id.*   Dr. King diagnosed mild dysthymia. R. 71.  He suggested that Beza would benefit from psychiatric care, and stated that her prognosis was "fair."  *Id.*  Dr. King observed that Beza was well-groomed and established good rapport.  R. 70.  Her affect was friendly and appropriate; her mood was euthymic; and her "fund of information was adequate."  *Id.*  Dr. King noted that while Beza reported hearing her mother's voice on occasion, she was not hallucinating during the examination and had no delusions, suicidal ideation, or paranoid trends.  *Id.*  Dr. King also noted that Beza's intellectual functioning was average, and her ability to perform simple arithmetic, insight, judgment, and attention and concentration span were all adequate.  *Id.*  Dr. King also opined that Beza had "satisfactory" abilities to carry out instructions and respond to supervision and work pressures.  R. 71.

Dr. E. B. Balinberg performed a physical consultative examination on the same day, December 3, 2001.  R. 106-08.  Beza reported being depressed and having problems breathing since she was seventeen years-old.  R. 106.  Dr. Balinberg diagnosed diabetes mellitus (which he noted was "under treatment") and a history of bronchial asthma.  R. 107.   A Pulmonary Function Test was "[s]uggestive" of restrictive respiratory dysfunction.  *Id.*; R. 109.  Dr. Balinberg recommended that Beza lose weight and follow-up with a treating physician.  R. 107-08.  His prognosis was that "[t]his is a chronic condition."  R. 108.  He also opined as to Beza's functional

-28-

capacity to do work, stating that based on his abnormal findings, Beza had "some restriction" in her ability to run, walk fast, and climb many steps, and should avoid respiratory irritants such as dust, chemicals, and fumes.  *Id.*  The rest of Dr. Balinberg's examination revealed normal results.

As she lay on the examination table, Beza did state that lying down made her feel she was choking, but Dr. Balinberg also observed that Beza was not in any respiratory distress during her visit.  R. 106.  Dr. Balinberg noted that Beza's mood was depressed, but she was able to "relate correctly."  *Id.*  Her lungs were clear with no wheezes, rales, or rhonchi.  R. 107.  Her heart sounds were normal.  *Id.*  Her station and gait were normal, and she had no difficulty getting on and off the examination table.  *Id.*  Beza had the full range of motion with intact dexterity, and her neurological examination revealed normal strength, sensation, and deep tendon reflexes.  *Id.*

On January 3, 2002, Beza went to the MediSys Family Health Care clinic at Jamaica Hospital Medical Center ("MediSys") for re-fills of her medication. R. 207.  Beza stated that she ran out of medication a week prior to her visit.  *Id.*  Beza was instructed on the importance of nutrition and appointment compliance, and Beza stated that she understood.  *Id.*

Dr. M. Apacible, a state agency physician, completed a Mental Residual Functional Capacity Assessment of Beza on February 5, 2002.  R. 111-27.  Dr. Apacible stated that Beza had an Affective Disorder ("mild" Dysthymic Disorder).  R. 118.  Dr. Apacible opined that Beza was not significantly limited in most work-related abilities, but found that Beza was "moderately limited" in her ability to accept instructions and respond appropriately to criticism from supervisors and her ability to respond appropriately to changes in the work setting.  R. 111-12.  Dr. Apacible observed that Beza's records indicated improvement in her condition with appropriate

treatment.  R. 113.  Dr. Apacible also opined that Beza would have no difficulties maintaining

concentration, persistence, or pace, and no restriction of her activities of daily living as a result of

her mental condition.  R. 125.  She had no episodes of deterioration, and "mild" limitations in

maintaining social functioning.  *Id.*

On February 11, 2002, another state agency physician opined as to Beza's physical RFC.

R. 130-36.  The physician noted that Beza's primary diagnosis was asthma.  R. 130.  He also

opined that Beza could: lift or carry fifty pounds occasionally and twenty-five pounds ffrequently;

stand, walk, and sit approximately six hours in an eight-hour workday; and push and pull without

limitation.  R. 131.  Beza had occasional limitations in her ability to climb, and had to avoid

concentrated exposure to extreme cold and fumes, odors, dusts, gases, and poor ventilation.  R.

132, 134.  Beza had no manipulative, visual, or communicative limitations.  R. 133-34.

On April 3, 2002, Dr. Blanco wrote another letter addressed "to whom it may concern" that

was almost identical to the note she wrote on March 28, 2001.  R. 145, 150.  Dr. Blanco again

stated she was writing the letter at Beza's request, and that due to Beza's major depression and

"generalized anxiety," Beza was unable to work.  R. 145.

Beza went to MediSys for medication re-fills on June 27, 2002.  R. 204-05.  She refused

"blood work."  R. 204.  She offered no complaints and appeared alert.  *Id.*  On September 30 2002,

Beza returned for more medication re-fills.  R. 202-03.  On December 28, 2002, Beza returned to

MediSys with complaints of pain on the left side of her neck.  R. 201.  She reported sleeping in an

awkward position a few days before her visit.  *Id.*  The doctor assessed muscle spasms, gave her

Celebrex for the pain, and told her to follow-up if her symptoms worsened.  R. 200.

-30-

On February 3, 2003, Beza went to MediSys Family Health Care unit at Jamaica Hospital Medical Center for her asthma and high glucose. R. 199. She was treated with medication and glucose, and the treating examiner noted that Beza's asthma was better with less coughing, wheezing, and chest stiffness. *Id.* Beza was told to follow-up in three days. R. 198. On February 6, 2003, Beza returned for her follow-up appointment, without any noted complaints. R. 196-97.

On March 11, 2003, Beza returned to MediSys to obtain re-fills of her medications. R. 192-93. Beza went to MediSys on July 7, 2003, complaining of shortness of breath for two days. R. 195. The treatment notes are mostly illegible, but do not indicate any that Beza received any serious treatment. R. 194-95. Beza, in fact, deferred some treatment and stated that she would return to the hospital if her shortness of breath increased. R. 194.

On September 8, 2003, Beza went to MediSys, stating that she needed re-fills of her medication and that she felt "tight." R. 191. She also reported wheezing since the previous night and using her inhaler numerous time until the morning. *Id.* Beza was treated with Albuterol and given oxygen. *Id.* The hospital gave her re-fills of medication and "asthma education." R. 190. Beza returned to MediSys as a follow-up appointment on September 24, 2003. R. 189. On October 10, 2003, Beza went to MediSys because of heavy menstruation, and as a follow-up to a test for fibroids three weeks prior. R. 187. The impression was that Beza was "Menorrhagia [heavy menstrual bleeding]/Anemic," but the doctor ruled out fibroids. R. 186.

Beza moved from New York to Florida around December 2003. On December 31, 2003, Beza went to Orlando Regional Healthcare hospital for inpatient care. R. 175. The discharge assessment dated January 8, 2004 indicates that Beza was instructed to take various medication for

asthma, use an inhaler, and make follow-up appointments.  *Id.*  Beza returned to the hospital and

was admitted to the emergency room on January 11, 2004.  R. 174.  Her patient instructions, dated

January 11, 2004, indicate that the physician directed her to continue high glucose treatment as

directed by her doctor, take Xanax only at night, drink fluids, and follow-up with the physician.

*Id.*

On February 16, 2004, Beza sought counseling with by Latha Babuji, a registered nurse

practitioner at Seminole Community Mental Health Center.  R. 178.  Beza reported that her

financial situation caused her a lot of stress, and that she could not think clearly because of feeling

stressed.  R. 179.  Babuji noted that during the interview, Beza was "fidgety" and moved her legs

throughout her visit.  *Id.*  Her thoughts were organized and coherent, and her insight and judgment

were good.  R. 178-79.  Beza's attention and concentration w fair.  Babuji's diagnoses was

"major" recurrent Depression and generalized Anxiety Disorder, Diabetes, and Asthma.  R. 179.

On April 22, 2004, Beza was still anxious, but reported sleeping well.  R. 177.  Beza told Babuji

that she was taking Paxil, BuSpar, and Trazodone, and did not report any side effects.  *Id.*  On June

17, 2004, Beza saw Babuji again, and complained of having difficulty sleeping.  R. 176.  Beza,

again, appeared anxious, but her attention and concentration were fair.  *Id.*  Babuji stated that

Beza's cognition was "average," and her memory was intact.  *Id.*  Babuji recommended that Beza

continue taking her current medication.  *Id.*

On July 8, 2004, Beza testified at the hearing before the ALJ.  R. 246.  The ALJ explained

to Beza that she could be represented, either by an attorney or nonattorney, and confirmed that

Beza waived her right to proceed with the hearing without a representative.  R. 248.  Beza testified

that she is scared to leave her apartment, and stated that she did not know why she was scared.  R. 253.  Beza also testified that since she moved to Orlando, she traveled out of town once when her son drove her to New York around April 30, 2004.  R. 255.  Beza also testified that her former work as a postal clerk did not require lifting any weight.  R. 256.  She stated that the lifting was done by the mail handlers, not the clerks.  *Id.*  Beza explained that she cannot work because of her diabetes, because she is "always . . . crying," and because sometimes, she cannot remember "things."  R. 257.  She reported getting sick if she did not take her medications, but did not mention having any side effects.  R. 257-60.

She stated that she received medical treatment from doctors in Orlando – her psychiatrist "Dr. Latta" and "Dr. Smith" from her visit to the Orlando Regional Healthcare hospital.  R. 259. She testified that she sees her Orlando psychiatrist once every two months, and that she had seen her four times since Beza moved to Orlando.  R. 259.  Beza's next appointment was scheduled for August 11, 2004, stated Beza.  *Id.*  Beza recounted being hospitalized as a result of her asthma for eight days from December 31, 2003 to January 8, 2004, and testified that she went to the hospital three or four times a year for her asthma when she lived in New York.  R. 261.  Beza added that she returned to Orlando Regional Healthcare hospital twice after her December 2003 stay – once to the emergency room for asthma, and the other time to the clinic.  R. 262.  Beza also described her daily activities.  She spends her time walking around the apartment, occasionally sitting in her rocking chair or lying down.  *Id.*  She also testified that sometimes she does housework, and that sometimes when her son helps her with her insulin shots.  R. 263.  The ALJ asked Beza for her

-33-

medical records from her December 2003 stay at Orlando Regional Healthcare hospital and the address of Beza's local doctors.  R. 258-59, 261, 263.

On August 12, 2004, Babuji saw Beza who appeared anxious and restless.  R. 181.  Beza reported being "depressed about taking many medications for her medical and mental issues."  *Id.* Babuji advised Beza on practicing relaxation techniques.  *Id.*  Beza's thoughts were organized and coherent, and her insight and judgment were fair.  *Id.*  Babuji noted that Beza's cognition was average, and her attention, concentration, and memory were fair.  *Id.*  On September 30, 2004, the ALJ issued a decision that Beza was not disabled and not entitled to benefits.  R. 22.

## B.   THE ANALYSIS

After conducting a thorough review of the evidence in the record, the ALJ determined that Beza retained the RFC to stand, walk, and sit six hours in an eight-hour workday, and lift fifty pounds.  R. 22, Finding 5.  Beza had occasional postural limitations (in climbing, balancing, stooping, kneeling, crouching, and crawling) and needed to avoid extreme cold, fumes, odors, dusts, gases, and poor ventilation.  *Id.*; R. 21.  She had moderate limitations in her ability to accept and to respond to criticism from a supervisor and respond appropriately in the work-setting, but could understand, remember, and carry out simple to detailed instructions.  R. 22, Finding 5.

Based on Beza's description of her past relevant work as a postal clerk and based on the description of the job as it is generally performed in the national economy as defined by the Dictionary of Occupation Titles, the ALJ found that Beza's RFC did not preclude her from performing her past relevant work.  R. 22, Finding 6-7.   Beza claims that the Commissioner erred in two ways: 1.) by failing to obtain relevant records and thereby failing to fully develop the record

(Docket No. 16 at 4-5); and 2.) by improperly concluding that Beza could meet the physical and mental requirements of her past relevant work (*id.* at 5-6).

      1.    <u>The ALJ's Duty to Develop the Record</u>

Beza first argues that the ALJ failed to fully and fairly develop the record in light of the fact that Beza was not represented by counsel at the time of her hearing. *Id.* Beza states that during the hearing, Beza testified that she received treatment from "Dr. Smith," and that she had been admitted to the hospital for eight days from December 31, 2003 to January 8, 2004. *Id.* at 5. Beza then notes that the ALJ asked Beza for further information about the hospital visit, and Beza provided a bill for a January 24, 2004 emergency room visit and a paper from South Seminole Hospital from December 31, 2003 to January 11, 2004. *Id.* Beza concludes her argument by contending that the ALJ erred by failing to obtain records and to elicit testimony that "could have lead to information relevant to [Beza's] claim." *Id.*

The Commissioner responds that Beza failed to meet her burden of proof and provide sufficient evidence about her condition, and argues that in general, substantial evidence supports the Commissioner's decision to deny disability. Docket No. 18-1 at 4-5. The Commissioner also specifically counters that the ALJ fully and fairly developed the record (which contains three consultative examinations ordered by the Office of Disability Determinations to further evaluate Beza's impairments). *Id.* at 10. The Commissioner is correct.

The record, viewed as a whole, shows that the record contains the relevant facts of the case, including those in favor of Beza's disability claim.[4]  In this case, the lack of counsel at the hearing did not prejudice Beza.  *See Smith v. Schweiker*, 677 F.2d at 830 ("[w]e are concerned not so much with whether every question was asked which might have been asked had [claimant] been represented by an attorney, as we are with whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.'").  Beza retained counsel after the hearing who submitted new evidence to the Appeals Council.[5]  R. 180.  Counsel for Beza retained after the hearing never submitted records from "Dr. Smith," and never submitted more records from Beza's December 31, 2003 admission to Orlando Regional Healthcare hospital.  As stated earlier, counsel did submit numerous hospital records and treatment notes.   The Appeals Council properly made the new evidence part of the record, and then denied review.  R. 6-8, 10.

Substantial evidence in the record, including the new evidence submitted to the Appeals Council, supports the Commissioner's decision to deny benefits.   The hospital records from New York, including those from Dr. Blanco, indicate that Beza received little serious treatment and experienced few if aany serious complications related to her ailments.  The majority of her hospital

---

[4]Beza correctly notes that where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  Docket No. 17 at 4.  This special duty requires the ALJ to "scrupulously and conscientiously" inquire of and explore all the relevant facts, and ensure that favorable as well as unfavorable facts are elicited.  *Cowart*, 662 F.2d at 735.  It is not clear that the special duty arose in this case.  First, Beza waived her right to representation.  On July 8, 2004, Beza signed a "Waiver of Right to Representation," acknowledging that she had been advised that she had the right to be represented by an attorney or non-attorney at her hearing, and stating that she waived the right to representation.  R. 172.  At the beginning of the hearing, the ALJ explained that Beza had the right to representation, and confirmed that Beza wished to proceed without representation.  R. 248.  Also, it appears that Beza was represented at various stages of her claim for benefits.  A lawyer, Derrick J. Rodriguez, requested that Beza's case be transferred from New York to Orlando on March 8, 2004 (R. 160-61), and Evane C. Holmes represented Beza in New York (R. 156-59).  Further, Beza retained counsel after the hearing who submitted new evidence to the Appeals Council.  R. 180.

[5]Counsel who submitted new evidence to the Appeals Council also represents Beza currently on her appeal.

visits were to obtain medication re-fills, and a few times, Beza admitted that she had run out of medication *before* her visits to ask for re-fills. *See* R. 102, 207. Beza was admitted to the hospital for six days in November 2001 due to asthma and an upper respiratory tract infection (R. 79, 139), but subsequent hospital visits do not indicate any serious complaints. *See, e.g.*, R. 192-93, 204-05. Beza went to the hospital twice since moving to Orlando, but none of the records submitted indicate that Beza underwent any serious treatment, or that any complaints or treatment would affect Beza's physical and mental capabilities to work.[6] *See* R. 174-75.

The ALJ also properly rejected Dr. Blanco's opinion that Beza is "unable to work" because (as the ALJ correctly noted) Dr. Blanco did not support his opinion by delineating any of Beza's functional limitations, and because the opinion  was unsupported by objective medical evidence. R. 20. Dr. Blanco's own notes indicate that Beza reported feeling better at times, and that Dr. Blanco encouraged Beza to be more active. R. 92-93. Further, treatment notes from Babuji indicate that Beza's thoughts were organized and coherent; her insight and judgment were good; and her attention and concentration were fair. *E.g.,* R. 178-79. Babuji stated that Beza's cognition was "average," and her memory was intact. R. 176. Nothing in either the registered nurse practitioner's notes, Dr. Blanco's notes, or the rest of the record indicate that the ALJ was incorrect in accepting the opinions of Dr. King and Dr. Apacible (the state agency physician) that Beza's mental condition imposed no significant limitations. The opinions and findings of Dr. Lin and Dr. Balinberg and the state agency physician's assessment of Beza's physical RFC also

---

[6]The records from Beza's Orlando hospital stays include a discharge assessment from her December 30, 2003 admission (R. 175), and instructions from the hospital dated January 11, 2004 (R. 174). The ALJ twice asked Beza to submit any records she had from her December 30, 2003 hospital stay. R. 261, 263. Neither Beza nor her counsel (who submitted new evidence to the Appeals Council) submitted any other records from her two Orlando hospital visits.

support the ALJ"s findings.  Substantial evidence in the fully and fairly-developed record supports

the Commissioner's decision.

                2.     <u>The Physical and Mental Requirements of Beza's Past Relevant Work</u>

      Beza next argues that the ALJ failed to make a sufficiently detailed inquiry about the

mental demands of Beza's past relevant work as a postal clerk, and whether her asthma would

affect her ability to perform that job.  Docket No. 17 at 6.  Beza specifically argues that the ALJ

only asked Beza about the lifting requirements of her job as a postal clerk, and that Beza's

moderate limitations (in her abilities to accept and to respond to criticism from a supervisor and to

respond appropriately in the work-setting )[7] would "have a negative impact" on Beza's ability to

perform her past relevant work.  *Id.*  The Commissioner responds that the Commissioner properly

determined the demands (both mental and physical) of Beza's past relevant work.  *Id.* at 12.  The

Commissioner is correct.

      According to Social Security Ruling 82-61, the ALJ may apply one of two tests to

determine if a claimant can perform the past relevant work.  A claimant will be found to be "not

disabled" if the claimant retains the RFC to perform: 1.) the actual functional demands and job

duties of the past relevant work; **<u>or</u>** 2.) the functional demands and job duties of the job as

generally required by employers in the national economy.  SSR 82-61 (emphasis added).  The ALJ

may rely on the Dictionary of Occupational Titles (DOT) descriptions to define that job as it is

usually performed in the national economy.  *Id.*  Further, even if the actual functional demands of

---

       [7]Beza also cites Dr. King's opinion (that Beza had "satisfactory" abilities to understand, carry out, and remember instructions and to respond appropriately to supervision, co-workers, and work pressures in a work setting) as support for her contention that her mental limitations negatively impact her ability to perform her past relevant work.  *Id.*  Dr. King's opinion, however, only supports the Commissioner's arguments.

the former work exceed those as described in the DOT, if the claimant can perform the functional demands and job duties as generally required by the employers throughout the national economy, the claimant should be found to be "not disabled." *Id.*

In this case, althoug the ALJ only asked Beza about the lifting requirements of her job during the hearing, the ALJ's decision properly compared the demands of Beza's past relevant work with her RFC to perform her prior job as a postal clerk, both as she described the job and as described in the Dictionary of Occupational Titles. R. 21. Nothing in either Beza's description or the DOT description indicates that Beza's moderate limitations in her abilities to accept and to respond to criticism from a supervisor and to respond appropriately in the work-setting would prevent Beza from performing her past work. *See* Docket No. 18-2. The ALJ did not err, as Beza contends, by "failing to inquire into the mental aspect of [Beza's] work." Docket No. 17 at 6.

Further, the ALJ agreed with the state agency phyisican and Dr. Balinberg's opinion that because of her asthma, Beza should be restricted from working around extreme cold fumes, odors, dusts, gases, poor ventilation, climbing, and respiratory irritants. R. 20. The ALJ considered Beza's asthma-related restrictions in considering the demands of Beza's past job. R. 21. Again, nothing in either Beza's description or the DOT description of her past relevant work indicates that these restrictions would preclude her from performing that job. *See* Docket No. 18-2. Substantial evidence supports the Commissioner's decision, and remand is unnecessary.

## VI.   <u>CONCLUSION</u>

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**. The Clerk should enter a judgment and close the case.

-39-

**DONE AND ORDERED** this 17th day of March, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia          30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL               33602

The Honorable Apolo Garcia
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL             32817